BRIAN SHERIDAN ET AL. *v.* JAMES
DESMOND ET AL.
(AC 15217)

Heiman, Spear and Hennessy, Js.

Argued April 21—officially released July 15, 1997

*Stephen M. Feinstein*, with whom were *Rebecca L. Balzac*, and, on the brief, *Kyle Barnett*, legal intern, for the appellant (defendant Dorothy Imhoff).

*Alan M. Doran*, with whom, on the brief, was *Bruce J. Corrigan, Jr.*, for the appellees (plaintiffs).

*Opinion*

SPEAR, J. The defendant Dorothy Imhoff appeals from the judgment of the trial court, rendered after a jury trial, in favor of the plaintiffs. On appeal, she claims that the trial court improperly denied her motion for a directed verdict because the plaintiffs failed to prove, in accordance with General Statutes § 34-51,[1] that her partner's tortious actions, which caused the plaintiffs' losses, were within the scope of the partnership business or that she authorized his actions. We reverse the judgment of the trial court on the first three counts and affirm the judgment as to the fourth count.[2]

The jury reasonably could have found the following facts. Dorothy Imhoff (defendant) and James Desmond, Sr.[3] (Desmond), owned, as tenants in common, commercial property located at 25 Perry Avenue in Norwalk.

---

[1] General Statutes § 34-51 provides: "Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act."

[2] The first three counts of the complaint are based on Imhoff's alleged liability for the tortious acts of her partner. We address those counts in part II of this opinion. The fourth count is based on a claimed failure to return the plaintiffs' security deposit and is discussed in part III herein.

[3] Although Desmond was originally named as a defendant in this case, the plaintiffs withdrew their case against him prior to trial.

The defendant authorized Desmond to manage the property and did not participate in the day-to-day operations of the business. The plaintiffs signed a one year lease for the property at 25 Perry Avenue commencing October 10, 1986. They operated a nightclub on the property.

Desmond owned a lot located at 41 Perry Avenue that adjoined 25 Perry Avenue, in which the defendant had no ownership interest. On July 21, 1989, Desmond began construction of a building on the lot at 41 Perry Avenue. During construction, a trench was dug that blocked the fire exit doors located at the rear of 25 Perry Avenue. On July 27, 1989, the fire marshal ordered the plaintiffs' club closed for a violation of the fire code resulting from the blocked exit doors. On September 22, 1989, after the trench was filled, the fire marshal informed the plaintiffs that they could reopen. On the same day, Desmond constructed barriers on 41 Perry Avenue that again blocked the plaintiffs' fire exit doors.

The plaintiffs instituted an action seeking an injunction against Desmond.[4] The injunction was granted, the barriers were removed, and the plaintiffs' business reopened on November 4, 1989. The plaintiffs vacated the premises in December, 1989.[5]

The following procedural history is relevant to this appeal. After Desmond's death, the administrator of his estate was joined as a defendant. Thereafter, the action was withdrawn as against Desmond's estate, and the plaintiffs filed a four count complaint against the defendant, alleging that the defendant and Desmond (1) intentionally and maliciously prevented them from

---

[4] Imhoff was not named as a party defendant in the injunction action.

[5] On November 4, 1988, the defendant and Desmond served a notice to quit on the plaintiffs based on the expiration of the lease. A summary process trial was held in July, 1989, and a judgment of possession was rendered in favor of the defendant and Desmond. That judgment was affirmed in *Desmond v. Sheridan*, 23 Conn. App. 811, 581 A.2d 285 (1990).

operating their business, (2) breached their covenant of quiet enjoyment, (3) violated the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., and (4) unlawfully withheld the plaintiffs' security deposit. The jury returned a general verdict in favor of the plaintiffs in the amount of $44,000.

After the close of evidence, the defendant filed a motion for a directed verdict, arguing, inter alia, that the plaintiffs failed to prove that she was liable for Desmond's wrongful acts pursuant to § 34-51. The trial court denied her motion and rendered judgment for the plaintiffs on the jury's verdict. This appeal followed.

I

Before we address the merits of the defendant's claim, we must first address the applicability of the general verdict rule. Under the general verdict rule, "if a jury renders a general verdict for one party, and no party requests interrogatories, an appellate court will presume that the jury found every issue in favor of the prevailing party." *Curry* v. *Burns*, 225 Conn. 782, 786, 626 A.2d 719 (1993). "Thus, in a case in which the general verdict rule operates, if any ground for the verdict is proper, the verdict must stand; only if every ground is improper does the verdict fall." *Staudinger* v. *Barrett*, 208 Conn. 94, 100, 544 A.2d 164 (1988).

The general verdict rule "rests on the sound policy of conservation of judicial resources, at both the appellate and trial levels. On the appellate level, the rule relieves an appellate court from the necessity of adjudicating claims of error that may not arise from the actual source of the jury verdict that is under appellate review. In a typical general verdict rule case, the record is silent regarding whether the jury verdict resulted from the issue that the appellant seeks to have adjudicated. . . . In the trial court, the rule relieves the judicial system from the necessity of affording a second trial if the

result of the first trial potentially did not depend upon the trial errors claimed by the appellant. Thus, unless an appellant can provide a record to indicate that the result the appellant wishes to reverse derives from the trial errors claimed, rather than from the other, independent issues at trial, there is no reason to spend the judicial resources to provide a second trial." (Citation omitted.) *Curry* v. *Burns*, supra, 225 Conn. 790.

In this case, we are able to determine that the result of the first trial was based, at least in part, on the defendant's claim of error on appeal. In order to support a finding of liability on any of the first three counts, or any combination thereof, the plaintiffs were required to prove that Desmond's actions were (1) within the scope of the partnership business or (2) authorized by the defendant. Count four of the complaint alleges that the defendant unlawfully withheld the plaintiffs' security deposit and recovery under that count is not dependent on the jury's finding that the defendant is vicariously liable for Desmond's tortious actions. Pursuant to § 47a-21 (d) (2),[6] recovery on the fourth count is limited to $8640 plus interest, an amount far less than the amount awarded. The jury's verdict, therefore, must have been based on a finding in favor of the plaintiffs on at least one of the first three counts, but the plaintiffs

---

[6] General Statutes § 47a-21 (d) (2) provides in relevant part: "Upon termination of a tenancy, any tenant may notify his landlord in writing of such tenant's forwarding address. Within thirty days after termination of a tenancy, each landlord other than a rent receiver shall deliver to the tenant or former tenant at such forwarding address either (A) the full amount of the security deposit paid by such tenant plus accrued interest as provided in subsection (i) of this section, or (B) the balance of the security deposit paid by such tenant plus accrued interest as provided in subsection (i) of this section after deduction for any damages suffered by such landlord by reason of such tenant's failure to comply with such tenant's obligations, together with a written statement itemizing the nature and amount of such damages. Any such landlord who violates any provision of this subsection shall be liable for twice the amount or value of any security deposit paid by such tenant . . . ."

proved none of those counts, as we discuss in part II. Accordingly, we do not apply the general verdict rule.

## II

We turn next to the defendant's claim that she was not liable for the tortious conduct of her partner and that the court should have granted her motion for a directed verdict. We agree.

"At the outset, we note the appropriate standard of review. In considering the trial court's denial of a motion for a directed verdict, we view the evidence in the light most favorable to the prevailing party. . . . Nevertheless, a verdict will be set aside and judgment directed if we find that the jury could not reasonably and legally have reached their conclusion. . . . A directed verdict is justified if on the evidence the jury could not reasonably and legally have reached any other conclusion." (Citation omitted; internal quotation marks omitted.) *Krondes* v. *O'Boy*, 37 Conn. App. 430, 433, 656 A.2d 692 (1995). "While it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation. . . . If the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury." (Citations omitted; internal quotation marks omitted.) *DiDomizio* v. *Frankel*, 44 Conn. App. 597, 600, 691 A.2d 594 (1997).

With this standard of review in mind, we turn now to the law concerning partnerships. Generally, "[r]ules governing the liability of a principal for the tortious acts of his agent . . . have been held to apply to the liability of one copartner for the tortious action of another." 68 C.J.S., Partnership § 168 (1950). The application of general principles of agency is in accord with the law of our state. See General Statutes § 34-42 (3).[7]

---

[7] General Statutes § 34-42 (3) provides: "The law of agency shall apply under this chapter."

Section 34-51, which is part of the Uniform Partnership Act, was codified in Connecticut in 1961. Pursuant to this statute, liability is imposed on a partner for the tortious acts of his partner only where (1) the act occurred in the ordinary course of the partnership's business, or (2) the tortfeasor partner acts with the authority of his partner or partners. "The test of partners' joint and several liability in tort is based on a determination whether the wrong was committed in behalf of and within the reasonable scope of the business of the partnership. If so, the partners are liable as joint tortfeasors. . . . But where the injury results from a wanton or willful act of one of the [partners], committed outside the agency of common business, then the [partner] doing the act and causing the injury is alone responsible, unless the act which constitutes the wanton or willful tort is authorized by the members of the partnership . . . ." 59A Am. Jur. 2d, Partnership § 650. "The connection with the partnership business or objective must rise above the level of mere speculation or surmise in order to establish a partnership purpose in the tortfeasor's conduct." Id., § 651.

## A

We must first determine whether Desmond's tortious actions occurred within the ordinary scope of partnership business. We conclude that they did not.

Our courts have yet to interpret the "ordinary course of the business" language contained in § 34-51. The defendant urges this court to adopt the factors set forth by the Massachusetts Supreme Judicial Court in *Kansallis Finance Ltd.* v. *Fern*, 421 Mass. 659, 659 N.E.2d 731 (1996).[8] In *Kansallis Finance Ltd.*, Stephen Jones

---

[8] The defendant also urges this court to rely on *Gramercy Equities Corp.* v. *Dumont*, 72 N.Y.2d 560, 531 N.E.2d 629, 534 N.Y.S.2d 908 (1988). That case, however, is concerned only with whether a joint venturer who committed an intentional fraud against a third party is entitled to indemnification from the other joint venturer. The test applied by the New York Court of Appeals

and the four defendants were partners in a law firm. The plaintiff requested an opinion letter from Jones regarding a loan and lease financing transaction. Jones and others, not defendants in the case, conspired to defraud the plaintiff and provided an opinion letter on the law firm's stationery that contained several intentional misrepresentations. The plaintiff sought to recover its losses from Jones and his coconspirators, but was unable to do so. The plaintiff then filed the underlying action against Jones' law partners, alleging, inter alia, that they were liable for Jones' actions because Jones acted within the scope of the partnership business when he caused the opinion letter to be issued.[9] The trial court instructed the jury that in order to hold the defendants liable for Jones' actions, Jones' wrongful act "must have: (1) been the kind of thing a law partner would do; (2) occurred substantially within the authorized time and geographic limits of the partnership; and (3) been motivated at least in part by a purpose to serve the partnership." (Internal quotation marks omitted.) Id., 662. The jury rendered a verdict in favor of the defendants and specifically found that, in issuing the opinion letter, Jones acted outside the scope of the partnership business. Id.

In answering a question certified to it from the United States Court of Appeals for the First Circuit, the Massachusetts Supreme Judicial Court held that the trial court's jury instruction was a correct statement of law.[10]

was not whether the fraudulent act occurred during the ordinary course of business; rather, the court asked whether the act occurred in the "ordinary *and proper* conduct" of the partnership business. (Emphasis in original.) Id., 565. This was the relevant question because the statute governing indemnification between partners required that the conduct not only be in the ordinary course of business, but that the conduct be proper as well.

[9] Both the trial court and the jury found that although Jones did not sign the letter, he arranged for a third party to do so and adopted or ratified the issuance of the letter.

[10] In determining the propriety of the trial court's instructions to the jury, the *Kansallis Finance Ltd.* court looked to 1 Restatement (Second), Agency

Id., 670. We find the reasoning of the *Kansallis Finance Ltd.* court to be persuasive, especially in light of the fact that Massachusetts has also adopted the Uniform Partnership Act and has an identical statute to the one at issue here.[11] Furthermore, its statutes also provide that the law of agency controls the interpretation of its partnership act. See Massachusetts Uniform Partnership Act, § 4 (3).

Application of these factors to the present case militates against a finding that Desmond's tortious acts were taken in the ordinary course of partnership business. First, Desmond's tortious actions are not the "kind of thing" a partner would do. The plaintiffs argue that "the eviction of tenants is in the ordinary course of business of real estate owners." That may be true, and Desmond and the defendant did institute a summary process action to evict the plaintiffs from the property. An attempt at an illegal, forceful eviction, however, accomplished by erecting barriers to prevent egress from fire exit doors is *not* the "kind of thing" a partner would do. Second, Desmond's actions did not occur within the geographic limits of the partnership. The barriers erected were not on the property owned by the partnership; rather, they were located on the property at

§ 228 (1) (1958), which provides: "(1) Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits . . . (c) it is actuated, at least in part, by a purpose to serve the master, and (d) if force is intentionally used by the servant against another, the use of force was not unexpectable by the master." Subsection (2) further provides: "Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master."

[11] Mass. Gen. Laws ch. 108A, § 13 provides: "Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership, or with the authority of his co-partners, loss of injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting the act."

41 Perry Avenue. Finally, the plaintiffs failed to present evidence that Desmond's actions were motivated by a purpose to serve the partnership. At trial, the plaintiffs opined that the only apparent reason for the erection of the barriers was to block their egress from the exit doors. They further testified that their relationship with Desmond had deteriorated and they believed he was acting out of vindictiveness. Moreover, when asked if Desmond's actions benefited the property located at 25 Perry Avenue, the plaintiff Shawn Desmond responded in the negative. "[A]n intentional and wilful attack committed by [one partner], to vent his own spleen or malevolence against the injured person, is a clear departure from his employment and his principal or employer is not responsible therefor." *Vrabel* v. *Acri*, 156 Ohio St. 467, 474, 103 N.E.2d 564 (1952).

Ordinarily, the determination of whether one is acting within the scope of partnership business is a question of fact. See, e.g., *King* v. *Board of Education*, 203 Conn. 324, 327, 524 A.2d 1131 (1987); 1 Restatement (Second), Agency § 228, comment (d) (1958). Where, however, it is clear that one is not acting within the scope of employment, the question becomes one of law. Id. We conclude, as a matter of law, that the jury could not reasonably have concluded that Desmond's actions were in furtherance of the partnership business.

B

We must next determine whether the defendant authorized Desmond's actions. We conclude that she did not.

The plaintiffs assert that the defendant's general grant of authority to Desmond to run the partnership business supports the finding that Desmond acted within her authority when he dug the trenches and erected the barriers that blocked the plaintiffs' fire exit doors. We disagree.

Generally, authority to manage a business includes authority "[1] to make contracts which are incidental to such business, are usually made in it, or are reasonably necessary in conducting it; [2] to procure equipment and supplies and to make repairs reasonably necessary for the proper conduct of the business; [3] to employ, supervise, or discharge employees as the course of business may reasonably require; [4] to sell or otherwise dispose of goods or other things in accordance with the purposes for which the business is operated; [5] to receive payment of sums due the principal and to pay debts from the principal arising out of the business enterprise; and [6] to direct the ordinary operations of the business." 1 Restatement (Second), supra, § 73.

Desmond's actions do not fit into any of those categories. Contrary to the plaintiffs' assertion, a general grant of authority to manage a business does not encompass authority to commit an intentional tort.

The plaintiffs also assert that the defendant ratified Desmond's actions by not acting to stop him when he erected the barriers. We are unpersuaded. Ratification is defined as "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account . . . [requiring an] acceptance of the results of the act with an intent to ratify, and with full knowledge of all the material circumstances. . . . *Russell* v. *Dean Witter Reynolds, Inc.*, 200 Conn. 172, 185, 510 A.2d 972 (1986)." (Citations omitted; internal quotation marks omitted.) *Gerber & Hurley, Inc.* v. *CCC Corp.*, 36 Conn. App. 539, 542, 651 A.2d 1302 (1995). Here, the plaintiffs failed to prove that Desmond's actions in digging the trench and erecting the barriers were done on the defendant's account. Furthermore, the defendant testified that she did not intervene in Desmond's actions because both the trench and barriers were located on his property, in which she

did not have an ownership interest. The plaintiffs did not offer any evidence to the contrary and failed to adduce evidence from which the jury could have found that the defendant intended to ratify Desmond's actions. Accordingly, we conclude that the jury could not reasonably have found that the defendant authorized or ratified Desmond's actions.

### III

Because we have already concluded that the general verdict rule does not apply here, we examine the fourth count of the amended complaint in isolation from the other three counts. The defendant does not assert or brief any claim with respect to the security deposit claim set out in the fourth count[12] and the amount claimed is definite and finite. We conclude that we may properly presume that the jury found for the plaintiffs on the fourth count. Under these circumstances, we discern no reason why the verdict and judgment as to this unchallenged claim should not stand. To do otherwise would mean reversing a portion of the judgment as to which there is no claim of error and would unfairly force the plaintiffs to prove the claim again. This would be especially egregious because the defendant offered no evidence to controvert the fourth count and no legal argument to refute the claim. The plaintiffs are entitled to twice the value of the $4320 security deposit, $8640.[13] They offered no evidence as to the proper rate of interest[14] to be applied to this amount

---

[12] The plaintiffs incorporated the first three counts of the amended complaint as part of the fourth count. The allegations in support of the security deposit claim are set out as a separate cause of action, therefore, the allegations as to the first three counts are merely surplusage. See *Edwards* v. *Tardif*, 240 Conn. 610, 621, 692 A.2d 1266 (1997).

[13] See footnote 6.

[14] General Statutes § 47a-21 (i) provides: "(1) On and after July 1, 1993, each landlord other than a landlord of a residential unit in any building owned or controlled by any educational institution and used by such institution for the purpose of housing students of such institution and their families, and

and the trial court did not instruct the jury on how to compute the interest. Consequently, $8640 is the maximum recovery.

The judgment is reversed as to counts one, two and three and the case is remanded with direction to render judgment in favor of the defendant Dorothy Imhoff on those counts and in favor of the plaintiffs in the amount of $8640 on count four.

In this opinion the other judges concurred.

---

each landlord or owner of a mobile manufactured home or of a mobile manufactured home space or lot or park, as such terms are defined in subdivisions (1), (2) and (3) of section 21-64, shall pay interest on each security deposit received by him at a rate of not less than the average rate paid, as of December 30, 1992, on savings deposits by insured commercial banks as published in the Federal Reserve Board Bulletin rounded to the nearest one-tenth of one percentage point, except in no event shall the rate be less than one and one-half per cent. On and after January 1, 1994, the rate for each calendar year shall be not less than the deposit index, as defined in subdivision (2) of this subsection, for that year, except in no event shall the rate be less than one and one-half per cent. On the anniversary date of the tenancy and annually thereafter, such interest shall be paid to the tenant or resident or credited toward the next rental payment due from the tenant or resident, as the landlord or owner shall determine. If the tenancy is terminated before the anniversary date of such tenancy, or if the landlord or owner returns all or part of a security deposit prior to termination of the tenancy, the landlord or owner shall pay the accrued interest to the tenant or resident within thirty days of such termination or return. In any case where a tenant or resident has been delinquent for more than ten days in the payment of any monthly rent, he shall forfeit any interest which would otherwise be payable to him for that month, except that there shall be no such forfeiture if, pursuant to a provision of the rental agreement, a late charge is imposed for failure to pay such rent within the time period provided by section 47a-15a. No landlord or owner shall increase the rent due on any quarters or property subject to the provisions of this section because of the requirement that interest be paid on any security deposit made with respect to such quarters or property."